**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**July 9, 2019**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2018AP1116**

**STATE OF WISCONSIN**

Cir. Ct. No. 2017CV36

**IN COURT OF APPEALS**
**DISTRICT III**

---

ESTATE OF BRENT J. ROPPE, BY ITS SPECIAL ADMINISTRATOR
JOSEPH K. ROPPE,

    PLAINTIFF-RESPONDENT,

  V.

JON L. ROPPE AND JEANETTE M. COLBERT-ROPPE,

    DEFENDANTS-APPELLANTS.

---

        APPEAL from a judgment of the circuit court for Washburn County: EUGENE D. HARRINGTON, Judge. *Affirmed*.

        Before Stark, P.J., Hruz and Seidl, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   After being diagnosed with terminal cancer, Brent Roppe executed a financial power of attorney (POA) naming his sister-in-law, Jeanette Colbert-Roppe, as his agent.   In her capacity as Brent's agent, Jeanette executed a quit claim deed transferring ownership of Brent's home to Jon Roppe—who was Brent's brother and Jeanette's husband.   Brent later sued Jon and Jeanette, seeking rescission of the quit claim deed and asserting a claim for theft by fraud.   Brent's estate ("the Estate") was ultimately substituted as plaintiff, and the circuit court later granted the Estate partial summary judgment, concluding Jeanette's execution of the quit claim deed violated both WIS. STAT. § 244.41(1)(b) (2017-18)[1] and the terms of the POA.   Following a bench trial, the court found that Jon and Jeanette had committed theft by fraud.   The court rescinded the quit claim deed and awarded the Estate damages, including $25,000 for Brent's emotional distress.

¶2     Jon and Jeanette now appeal, arguing:  (1) the circuit court erred by refusing to consider evidence extrinsic to the POA when ruling on the Estate's motion for partial summary judgment; (2) the court erred by determining no expert testimony was necessary to support the Estate's claim for Brent's emotional distress; and (3) the evidence was insufficient to support the court's finding that Jon and Jeanette committed theft by fraud.   We reject these arguments and affirm.

## BACKGROUND

¶3     In mid-December 2016, Brent was diagnosed with terminal stage IV lung cancer.   On December 23, 2016, Brent traveled from Wisconsin to visit Jon

_____

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

and Jeanette at their home in Arizona. Brent signed the POA on January 6, 2017, during his visit to Arizona. The POA named Jeanette as Brent's agent and, among other things, granted her the power to "sell … quitclaim … or otherwise dispose of an interest in real property." However, Article V of the POA provided:

**Limitations on Powers**

My Agent shall not exercise any of the powers for my Agent's own benefit or in satisfaction of a legal obligation of my Agent except and unless specifically provided for above.

¶4    During a video deposition on May 18, 2017, which was later played for the circuit court at trial, Brent testified that Jeanette entreated him to execute the POA. He further testified that before he signed the POA, Jeanette told him that he could tear up the POA at "any time" and it "would be no good anymore." According to Brent, Jeanette promised to return to Wisconsin with him to "help [him] get through this death." Brent testified he specifically told Jon and Jeanette during his visit to Arizona that he wanted all of his property to go to his son, Ryan.

¶5    Brent and Jeanette set out from Arizona for Wisconsin on January 10, 2017. However, Brent testified they had a falling out during their trip, and Jeanette appeared "more concerned about her and her dog and stuff and where she was staying than [his] health." They arrived in Wisconsin on January 12, but Jeanette left for Arizona again on January 17. Brent testified that on January 16, the day before Jeanette left Wisconsin, he told her that he was tearing up the POA. Based on Jeanette's prior representation to him, Brent believed that action would be sufficient to revoke the POA.

¶6    Brent's home was located in Birchwood, Wisconsin. At trial, Jeanette testified that after she returned to Arizona, she and Jon conducted a search

3

and learned that there were no liens on the Birchwood property, aside from a first mortgage. Thereafter, on February 1, 2017, Jeanette used her authority as Brent's agent to execute a quit claim deed transferring ownership of the Birchwood property to Jon.

¶7 Brent testified he first learned about the quit claim deed after speaking with his insurance agent on February 17 or 18, 2017. Brent stated he was "very upset" when he learned about the quit claim deed. He explained, "I stated right from day one that [the Birchwood property] was supposed to go to my son, Ryan. Regardless if [Jeanette] is Power of Attorney or not, it was supposed to go to my son." When asked how the transfer of the Birchwood property had affected his mental health, Brent responded:

> It's taken up a[n] awful lot of my, you know, time and everything, and it's stressing me out. It's causing me a lot of grief.

> I shouldn't even have to be going through it. I should be worried about my cancer and stuff and not about my home and my possessions.

¶8 Joseph Roppe—who was Brent's nephew and the special administrator of the Estate—similarly testified at trial that after Brent learned about the quit claim deed, he was "[u]nbelievably upset until the day he passed." Joseph testified Brent "loved [Jon] very much, and he couldn't believe that this is what was happening." Joseph also testified that after learning about the quit claim deed, he had "multiple conversations" with Jon on Brent's behalf, during which he tried to convince Jon to transfer the Birchwood property back to Brent. Jon refused to do so.

¶9 On February 27, 2017, Brent executed a document formally revoking the POA. He commenced the instant lawsuit against Jon and Jeanette on

4

March 29, 2017, seeking rescission of the quit claim deed. Brent later filed an amended complaint adding a claim against Jon and Jeanette for theft by fraud. Brent passed away on June 12, 2017, and the Estate was later substituted as plaintiff.

¶10 The Estate moved for partial summary judgment in January 2018, arguing the undisputed facts established that: (1) the quit claim deed was invalid because Brent had revoked the POA before the date of the deed; and (2) the quit claim deed violated Article V of the POA and various statutes. The circuit court granted the Estate's motion, agreeing that the quit claim deed was made in violation of both Article V and WIS. STAT. § 244.41(1)(b). In making this determination, the court refused to consider evidence outside the POA regarding Brent's intent. The court explained, "Before we get to that point, there has to be some ambiguity in the [POA]. If there is no ambiguity in the [POA], then collateral evidence may not be introduced to explain something that's clear on its face." The court concluded that under the POA's unambiguous terms, Jeanette did not have authority to transfer the Birchwood property to Jon. Accordingly, the court ordered that the Birchwood property be returned to the Estate.

¶11 The circuit court held a bench trial on the Estate's theft-by-fraud claim during April 2018. Jon and Jeanette's theory at trial was that they did not intend to steal any property from Brent because Brent had given Jeanette his "repeated express consent" to transfer the Birchwood property to Jon. In support of their position, Jon and Jeanette relied on the testimony of Karen Irvine, who testified she heard Brent say during a dinner party in December 2016 that he wanted Jeanette to act as his agent and wanted to transfer the Birchwood property to Jon and Jeanette because he did not "want to worry about the financial aspect of it" and wanted to "concentrate on [his] health."

¶12    Jon and Jeanette also introduced into evidence a "contract" dated January 3, 2017, which stated:

> I, Brent Roppe, of, Birchwood Wisconsin, being of sound mind and body do hereby declare this document as a legal contract made between my brother, Jon Leslie Roppe and his wife, Jeanette Marie Colbert-Roppe. In executing such document, I hereby declare that under my unusual circumstances being sick with terminal cancer; I [no] longer have any interest in reference to my house …. I indeed agree for my Brother, Jon Leslie Roppe and his Wife, Jeanette Marie Colbert-Roppe to claim ownership of my house and assume my home loan. I understand by agreeing to this contract this will save my house from going into foreclosure. I understand this too will assure me to still have a place to live. It is clear to me I will no longer be able to afford making house payments as my working days are over.

Brent's name was handwritten—but not signed—on the contract's signature line. The contract was signed by a notary and two witnesses. Jeanette testified at trial that Brent had drafted and signed the contract. However, Brent testified during his deposition that he had never seen the contract before, and the "signature" on the contract was not his. Brent also disputed that he agreed to transfer his home to Jon and Jeanette in order to avoid foreclosure, stating he had "never been late on a payment or anything."

¶13    The Estate did not present any expert testimony at trial to support its claim for emotional distress damages. Following the close of evidence, the circuit court asked the parties to brief the issue of whether such expert testimony was required. After considering the parties' briefs, the court concluded the Estate did not need to introduce expert testimony in order to recover damages for Brent's emotional distress.

¶14     The circuit court ultimately found that the Estate had established each of the elements of its theft-by-fraud claim. The court entered a judgment awarding the Estate damages, including $25,000 for Brent's emotional distress. Jon and Jeanette now appeal.

## DISCUSSION

### I. Failure to consider extrinsic evidence on partial summary judgment

¶15     Jon and Jeanette first argue that the circuit court erred by refusing to consider evidence outside the POA when ruling on the Estate's motion for partial summary judgment. Specifically, they assert the court should have considered evidence showing that Brent intended to allow Jeanette to transfer the Birchwood property to Jon. They contend this evidence was sufficient to raise a genuine issue of material fact as to whether Jeanette had authority to execute the quit claim deed.

¶16     Whether the circuit court erred by refusing to consider extrinsic evidence when interpreting the POA is a question of law that we review independently. *See Russ ex rel. Schwartz v. Russ*, 2007 WI 83, ¶13, 302 Wis. 2d 264, 734 N.W.2d 874. In *Praefke v. American Enterprise Life Insurance Co.*, 2002 WI App 235, 257 Wis. 2d 637, 655 N.W.2d 456, we established a "bright-line rule" that an agent under a POA may not make gratuitous transfers of the principal's assets to him- or herself "unless the power of attorney from which his or her authority is derived expressly and unambiguously grants the authority to do so." *Id.*, ¶¶16, 20. We further stated, "As a corollary to this bright-line rule, extrinsic evidence of the principal's intent to allow such gifts is not admissible." *Id.*, ¶20.

¶17    In this case, Article V of the POA unambiguously states: "My Agent shall not exercise any of the powers for my Agent's own benefit or in satisfaction of a legal obligation of my Agent except and unless specifically provided for above."   There is no other provision in the POA specifically authorizing Jeanette to transfer any of Brent's assets to herself or to Jon, her husband.  We therefore agree with the circuit court that the unambiguous language of the POA demonstrates Jeanette did not have authority to execute a quit claim deed transferring the Birchwood property to Jon.  As such, the court properly refused to consider extrinsic evidence regarding Brent's intent.

¶18    In support of their argument that the circuit court should have considered extrinsic evidence, Jon and Jeanette rely on **Russ.**   There, the principal—Johnnie—filed a lawsuit asserting that her agent under a POA—Elliott—had breached his fiduciary duties to her by converting funds from a joint checking account that he and Johnnie had opened before the POA was executed. **Russ**, 302 Wis. 2d 264, ¶1.  On appeal, our supreme court agreed with Johnnie that a POA agent "has a fiduciary duty to the principal, and that the agent is usually prohibited from self-dealing unless the power to self-deal is written in the POA document." *Id.*, ¶28.  However, the court stated that in the case at hand, the prohibition against self-dealing was "complicated" by the fact that Johnnie and Elliott had opened the joint checking account in 1992, had shared the joint account for more than six years before they executed the POA, and had continued to use the joint account after the POA was executed. *Id.*

¶19    Specifically, the court explained that pursuant to statute, the parties to a joint account may withdraw or use the funds in the account without restriction "unless there is clear and convincing evidence of a different intent." **Russ**, 302 Wis. 2d 264, ¶29 (quoting WIS. STAT. § 705.03 (2003-04)).  The court held that

the POA was not "clear and convincing evidence of a different intent" because it was "silent as to whether Johnnie intended to change the way income flowed into or out of the joint account after the execution of the POA." *Id.*, ¶¶29-30.

¶20 The court therefore explained that the facts in *Russ* gave rise to "conflicting and inconsistent presumptions." *Id.*, ¶31. On one hand, "[w]hen funds are deposited into a joint bank account, donative intent is presumed." *Id.* On the other hand, a POA agent has a fiduciary duty not to engage in self-dealing, and "[w]hen a POA agent, for the agent's own use, transfers funds deposited by the principal, without written authority in the POA document to do so, a presumption of fraud is created, regardless of whether the funds were deposited before or after the execution of the POA." *Id.*, ¶32. The court held:

> Under such circumstances, as well as in cases where a power of attorney agent actively uses his or her authority to create a joint account with the principal, thereby triggering a presumption of fraud, extrinsic evidence may be admissible to determine the intent of the parties. The prohibition against the admissibility of extrinsic evidence of the parties' intent to allow the making of gifts, as set forth in *Praefke*, 257 Wis. 2d 637, ¶20, would not apply in such cases.

*Russ*, 302 Wis. 2d 264, ¶36 (footnotes omitted).

¶21 Unlike *Russ*, this case does not involve conflicting presumptions. Rather, in this case, we simply have a POA that: (1) unambiguously prohibited self-dealing by Jeanette; and (2) did not specifically grant Jeanette authority to transfer Brent's property to either herself or Jon. This case is therefore analogous to *Praefke*, not *Russ*. As a result, the circuit court properly refused to consider

9

extrinsic evidence of Brent's intent when deciding whether the POA granted Jeanette authority to execute the quit claim deed.[2]

¶22    In addition, we agree with the circuit court that Jeanette's execution of the quit claim deed violated WIS. STAT. § 244.41(1)(b).  That statute provides, in relevant part:

> (1)  An agent under a power of attorney may do any of the following on behalf of the principal or with the principal's property *only if the power of attorney expressly grants the agent the authority* and the exercise of that authority is not otherwise prohibited by another agreement or instrument to which the authority or property is subject:
>
>   ….
>
> (b)  Make a gift.

Sec. 244.41(1)(b) (emphasis added).  It is undisputed that the POA in this case did not expressly grant Jeanette the authority to make gifts.  The evidence shows, however, that Jeanette gifted the Birchwood property to Jon by transferring it to him for no consideration.  The transaction therefore violated § 244.41(1)(b), in addition to Article V of the POA.

¶23    In summary, the circuit court properly refused to consider extrinsic evidence when ruling on the Estate's partial summary judgment motion.  Based on

---

[2]  Contrary to Jon and Jeanette's assertion, the "contract" dated January 3, 2017, does not give rise to a presumption that Jeanette had authority to transfer the Birchwood property to Jon. Setting aside the fact that Brent denied signing the contract or ever having seen it before his deposition, Jon and Jeanette do not cite any legal authority supporting their assertion that the existence of the contract gives rise to a presumption regarding Brent's intent.  We need not address arguments that are unsupported by references to legal authority. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).  In addition, the fact that the POA was executed after the contract and did not expressly grant Jeannette authority to transfer the property to Jon further belies any claimed presumption about Brent's intent.

the unambiguous language of the POA, the court properly concluded that Jeanette lacked authority to transfer the Birchwood property to Jon. The court also correctly concluded that Jeanette's execution of the quit claim deed violated the plain language of WIS. STAT. § 244.41(1)(b). Under these circumstances, the court properly granted the Estate partial summary judgment and ordered the Birchwood property returned to the Estate.

**II. Failure to require expert testimony regarding Brent's emotional distress**

¶24    Jon and Jeanette next argue that the circuit court erred by concluding the Estate was not required to produce expert testimony to support its claim for damages for Brent's emotional distress. They contend expert testimony was necessary "to distinguish whether or not Brent … was suffering from emotional distress due to his impending terminal condition or from issues arising from" Jeanette's execution of the quit claim deed.

¶25    We disagree. Whether expert testimony is necessary in a given case is a question of law that we review independently. *Grace v. Grace*, 195 Wis. 2d 153, 159, 536 N.W.2d 109 (Ct. App. 1995). Expert testimony is necessary only where the matter in question "is not within the realm of ordinary experience and lay comprehension." *White v. Leeder*, 149 Wis. 2d 948, 960, 440 N.W.2d 557 (1989). "The requirement of expert testimony is an extraordinary one, and is to [be] applied by the trial court only when unusually complex or esoteric issues are before the [fact finder]." *Id.*

¶26    Here, the issue of whether Jon and Jeanette's conduct caused Brent emotional distress was not outside the realm of ordinary experience and lay comprehension. Brent testified during his deposition that he was "very upset" about Jeanette's execution of the quit claim deed because he intended all of his

property to go to his son, Ryan. He stated the situation had "stress[ed] [him] out" and "caus[ed] [him] a lot of grief" at a time when he should have been focused on his health. Brent's nephew, Joseph, similarly testified that Brent was "[u]nbelievably upset" about the quit claim deed "until the day he passed." Joseph emphasized that Brent "loved [Jon] very much" and "couldn't believe that this is what was happening." Based on this testimony, and its own lay experience, the circuit court could reasonably determine that Jon and Jeanette's conduct caused Brent emotional distress.

¶27 Jon and Jeanette assert two other witnesses testified at trial that Brent was upset because of his terminal illness. In light of that testimony, they argue there was no basis for the circuit court to determine the true cause of Brent's emotional distress without an expert opinion. However, when acting as fact finder, the circuit court is charged with assessing the witnesses' credibility and determining the weight to be given to their testimony. *See State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345. The mere fact that there was conflicting lay testimony at trial does not mean that expert testimony was required for the court to determine whether Jon and Jeanette's conduct caused Brent emotional distress. Rather, the court could make that determination by assessing the lay witnesses' credibility and considering their testimony in light of the court's own experience.

¶28 Jon and Jeanette also rely on our decision in *Holsen v. Heritage Mutual Insurance Co.*, 182 Wis. 2d 457, 513 N.W.2d 690 (Ct. App. 1994), *vacated*, 185 Wis. 2d 1, 517 N.W.2d 448 (1994), to support their claim that expert testimony was required in this case. We conclude their reliance on *Holsen* is

misplaced for two reasons. First, our decision in **Holsen** was later vacated by the supreme court.[3] Second, unlike Jon and Jeanette, we do not read **Holsen** as establishing a bright-line rule that expert testimony is required to support an emotional distress claim in any case involving multiple possible causes of a plaintiff's emotional distress.

¶29 In **Holsen**, the plaintiffs alleged that a funeral home had caused them emotional distress by substituting another body for that of their deceased father. *Id.* at 460. They alleged the funeral home's conduct had caused them to suffer a wide variety of emotional and physical ailments, including extreme anger, poor impulse control, recurring nightmares, stress, depression, anxiety, sleeplessness, lethargy, headaches, weight gain, weight loss, diarrhea, constipation, neck pain, frequent colds, nausea, irritable bowel syndrome, and paranoia. *Id.* at 463. We concluded that determining which of these symptoms, if any, were caused by the funeral home's conduct was outside the realm of an ordinary juror's experience. *Id.* at 463-64. However, that is not the case here. For the reasons explained above, we conclude that under the circumstances presented in this case, the extent to which Jon and Jeannette caused or added to Brent's emotional distress is an issue within the realm of ordinary lay experience.

¶30 We also agree with the Estate that our decision in **Hicks v. Nunnery**, 2002 WI App 87, 253 Wis. 2d 721, 643 N.W.2d 809, undercuts Jon and Jeanette's

---

[3] The supreme court vacated our decision in **Holsen** and remanded the matter to the circuit court for further proceedings consistent with the supreme court's decision in **Bowen v. Lumbermens Mutual Casualty Co.**, 183 Wis. 2d 627, 517 N.W.2d 432 (1994). *See Holsen v. Heritage Mut. Ins. Co.*, 185 Wis. 2d 1, 2, 517 N.W.2d 448 (1994). In **Bowen**, the court concluded that in a cause of action for negligent infliction of emotional distress, a plaintiff must prove "severe emotional distress," but the plaintiff need not prove "physical manifestation of that distress." **Bowen**, 183 Wis. 2d at 632.

claim that expert testimony was required here. In **Hicks**, the plaintiff asserted a legal malpractice claim against an attorney who had previously represented him in criminal proceedings. *Id.*, ¶3. A jury found the attorney negligent and awarded the plaintiff over $2.6 million in damages. *Id.*, ¶13. On appeal, the attorney argued the circuit court should have granted him judgment notwithstanding the verdict because the plaintiff had failed to prove that he suffered severe emotional distress as a result of his attorney's conduct. *Id.*, ¶24. The attorney emphasized that the plaintiff had not submitted any "psychological or psychiatric testimony" to support an emotional distress claim. *Id.* In addressing this argument, we observed that "[s]everal appellate decisions note the presence of expert testimony in the record as supporting the severity of a plaintiff's emotional distress, but we are aware of none that require expert testimony as a legal prerequisite for recovery." *Id.*, ¶26. This statement supports our conclusion that the Estate was not required to produce expert testimony in order to recover damages for Brent's emotional distress.

### III. Sufficiency of the evidence

¶31 Finally, Jon and Jeanette argue the evidence at trial was insufficient to support the circuit court's determination that they committed theft by fraud. "When considering the sufficiency of the evidence, we apply a highly deferential standard of review." *Jacobson v. American Tool Cos.*, 222 Wis. 2d 384, 389, 588 N.W.2d 67 (Ct. App. 1998). We will not set aside the circuit court's factual findings unless they are clearly erroneous. WIS. STAT. § 805.17(2). A finding of fact is clearly erroneous when it is against the great weight and clear preponderance of the evidence. *Phelps v. Physicians Ins. Co. of Wis.*, 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615. When the circuit court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and the weight to

be given to their testimony. *Peppertree Resort Villas*, 257 Wis. 2d 421, ¶19. When more than one reasonable inference can be drawn from the credible evidence, we must accept the inference drawn by the circuit court. *Id.*

¶32 WISCONSIN STAT. § 895.446(1) provides a civil cause of action for violations of certain criminal code provisions, including WIS. STAT. § 943.20. As relevant here, § 943.20(1)(d) prohibits "[o]btain[ing] title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." In order to prove a civil theft-by-fraud claim under § 943.20(1)(d), a plaintiff must establish six elements by a preponderance of the evidence: (1) that the defendant made a false representation to the owner of the property; (2) that the defendant knew the representation was false; (3) that the defendant made the representation with the intent to deceive and defraud the property's owner; (4) that the defendant obtained title to the property as a result of the false representation; (5) that the property's owner was deceived by the defendant's representation; and (6) that the owner was defrauded by the defendant's representation. *See Malzewski v. Rapkin*, 2006 WI App 183, ¶¶21-22, 296 Wis. 2d 98, 723 N.W.2d 156.

¶33 The evidence in this case was sufficient for the circuit court to find that the Estate proved each element of theft by fraud by a preponderance of the evidence. Brent testified during his deposition that before he signed the POA, Jeanette told him he could tear up the POA at "any time" if he no longer wanted her to act as his agent and the POA "would be no good anymore." In essence, Jeanette represented to Brent that if he tore up the POA, she would no longer have authority to act as his agent under that instrument. Brent further testified he told Jeanette on January 16, 2017, that he was tearing up the POA and no longer

wanted her to act as his agent. Nonetheless, on February 1, 2017, Jeanette used her authority as Brent's agent to execute the quit claim deed transferring the Birchwood property to Jon. Brent testified he first learned about the quit claim deed from his insurance agent on February 17 or 18, 2017. Despite efforts by Brent's nephew—Joseph—Jon and Jeanette refused to return the Birchwood property to Brent.

¶34 Based on the evidence summarized above, the circuit court could reasonably find that Jeanette made a false representation to Brent in order to induce him to sign the POA—specifically, that he could tear up the POA at any time and she would no longer be able to act as his agent. Given Jeanette's subsequent conduct in executing the quit claim deed after Brent told her that he was tearing up the POA, the court could further find that Jeanette knew the representation in question was false and made it with the intent to deceive and defraud Brent. The court could also find that Brent was, in fact, deceived and defrauded because he believed that tearing up the POA would revoke Jeanette's authority to act as his agent. Finally, the court could reasonably find that, by virtue of her false representation to Brent, Jeanette was able to transfer title to the Birchwood property to Jon.

¶35 In arguing that the evidence was insufficient to establish these elements, Jon and Jeanette cite testimony that may have supported contrary findings. However, their argument in this regard ignores our standard of review. If more than one reasonable inference can be drawn from the credible evidence, we must accept the inference drawn by the circuit court. *Peppertree Resort Villas*, 257 Wis. 2d 421, ¶19. The court's factual findings in this case are supported by the evidence summarized above, and, as such, they are not clearly erroneous. *See* WIS. STAT. § 805.17(2).

¶36    Jon and Jeanette also argue the circuit court erred by finding that Brent was an "adult at risk" under WIS. STAT. § 943.20(2)(ac). They assert that finding "suggested [Brent] was somehow vulnerable" when he agreed to sign the POA. They contend the testimony of the Estate's own witnesses demonstrated that was not the case.

¶37    The circuit court was not required to make a finding that Brent was an adult at risk under WIS. STAT. § 943.20(2)(ac) in order to find that Jon and Jeanette had committed theft by fraud under § 943.20(1)(d). Nor was the court required to find that Brent was "vulnerable" at the time he signed the POA. The court merely needed to find that the Estate had established the six elements of a theft-by-fraud claim discussed above. As we have already explained, the evidence was sufficient to support the court's findings that those elements were satisfied. As such, even if the court erred by finding that Brent was an adult at risk under § 943.20(2)(ac), any error in that regard was harmless. *See* WIS. STAT. § 805.18.

¶38    Jon and Jeanette also rely on ***Malzewski***, which cited a federal magistrate judge's decision for the proposition that "[t]he effect of [WIS. STAT.] §§ 895.80 and 943.20(1)(d) is simply to provide a specific remedy for certain instances of the tort of fraud in the inducement." ***Malzewski***, 296 Wis. 2d 98, ¶22 (quoting ***Dow v. Poltzer***, 364 F. Supp. 2d 931, 940 (E.D. Wis. 2005)). Jon and Jeanette argue that to prevail on a claim for fraud in the inducement, a plaintiff must show the defendant's misrepresentation occurred "before contract formation." *See* ***id.*** (quoting ***Kaloti Enters., Inc. v. Kellogg Sales Co.***, 2005 WI 111, ¶30, 283 Wis. 2d 555, 699 N.W.2d 205). They contend the Estate failed to show in this case that Jeanette made any misrepresentation to Brent before he signed the POA.

¶39 We disagree. As explained above, the evidence at trial supported a finding that Jeanette made a false representation to Brent that he could tear up the POA at any time and she would cease acting as his agent. That misrepresentation occurred "before contract formation"—i.e., before Brent signed the POA. We therefore reject Jon and Jeanette's argument that the timing of Jeanette's misrepresentation defeats the Estate's theft-by-fraud claim.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.